## NEW YORK SUPERIOR COURT

THE HOME INSURANCE COMPANY, Respondents agt. THE WESTERN TRANSPORTATION COMPANY, Appellants

Where the plaintiffs, an insurance company, bring an action to recover damages for an injury to a cargo of grain on board of a vessel, caused by the negligence of the defendants as common carriers, and claim such damages by a title derived from the consignees of the cargo, acquired before the commencement of the action—they having insured the cargo on its voyage under an open policy—any settlement made by the defendants with the consignees for such claim, unless such defendants had no notice of such assignment to the plaintiffs, would not prevent a recovery by the plaintiffs.

Also, if the plaintiffs had a right in equity to such assignment, before such settlement, and the defendants knew the facts out of which such equitable right arose, a settlement made in fraud of such right would be void.

It appears to be well settled in this state and in Massachusetts, that where an owner of goods insured, and damaged by perils insured against, abandons all *spes recuperandi* to the underwriter, the latter, on paying the loss, is entitled to be subrogated to all the rights of the insured, to recover against third parties who caused the damage, by neglect or otherwise.

A common carrier is an insurer as well as the underwriter, and his rights seem to depend entirely on the action of the owner, who may, by previous agreement, give either the preference in having a claim against the other, in case of a loss.

*It seems*, that the payment by the plaintiffs (underwriters) of the loss alone, particularly as a total one of the grain damaged, entitled the plaintiffs to be subrogated to the rights of the consignees, so far as such loss was concerned.

*General Term, October,* 1866. *Heard October* 18, 1866.
*Before* ROBERTSON, *Ch. J.,* MONELL, *J.*

THIS action was brought to recover damages for injury to a cargo of wheat on board of a vessel on the Erie canal, in the year 1860, caused by the negligence of the defendants

in their transportation of it as common carriers from Buffalo to New York. The plaintiffs claimed such damages by a title derived from the consignees of such cargo (Messrs. L. Roberts & Co.), and acquired before the commencement of this action. The plaintiffs insured such cargo on its voyage, under an open policy. The defendants gave a bill of lading for its delivery absolutely to the consignees, in the same condition as when shipped, " damage or deficiency in quantity to be deducted from the charges." The cargo was damaged by water, near a place called Fort Plain. An agent of the defendants (Stout) immediately informed the consignees of the injury. An agent of the latter (Higgins) forthwith notified the plaintiffs thereof. The cashier and general agent of the defendants (Clapp) also telegraphed, shortly after, to an agent of the plaintiffs (Cary), to "take charge of the cargo on account of whom it might concern." Such agent (Cary), after removing the cargo from the boat, during the same year, sold the damaged portion (1,781 16-60th bushels), with the approbation of an agent of the defendants (Chase), and in the following spring transhipped the residue by another vessel (the Northamptonshire) to New York, where it was received by the consignees. They, by their agent (Requa), gave a receipt for such grain, on the 9th of May, 1861, to the defendants' agent (Stout), in the following words and figures :

" Received, New York, May 9, 1861, from the Western Transportation Company, per boat Northamptonshire, in good order, as marked in the margin, subject to the terms and conditions of the notice of the arrival of this property from said company, herewith served, fifty-seven hundred and twenty bushels of wheat, less seventeen hundred and eighty-one and sixteen-sixtieth bushels, received by consignees at Fort Plain, from boat Lyman Denison."

On the back of such receipt, when signed, were the following words and figures :

"Fr't from Oswego, 3,938 44-60 bu. C. B...... $590 81

1,781 16-60, 49-60 ....... 87 81

"Advance charges, $457................... 457 60

| | |
|---|---:|
| " Days interest on $457.60.................. | 13 96 |
| | $1,149 38 |
| " Towing................................ | 8 00 |
| | $1,157 38 |
| " Less for general average................. | 50 00 |
| | $1,107 38 |
| " 56 2-60 bush. short ($1.30)............... | 72 85 |
| | $1,034 53 " |

On the 20th of May following, the plaintiffs, after receiving the proceeds of the sales of the damaged grain, paid the consignees the full amount of their loss ($2,600); and the latter thereupon executed a written assignment to the former of all their claims upon the master of the vessel by which such grain was shipped, *or any other person*, for damage thereto.

The complaint alleges the shipment of the grain in question, the undertaking to the consignees by the master of the vessel in which it was shipped, as agent of the defendants, to transport it safely, and the injury by their negligence in its voyage. Also, the assignment by the consignees of all their claims for such damage, before the commencement of this action. The answer takes issue upon all the allegations in the complaint, except so far as the same are admitted therein. It then alleges that certain advances made by the shippers were to be refunded in case the vessel by which such grain was shipped was frozen in the canal, so as to be unable to perform her voyage; that the vessel was compelled to suspend the prosecution of her voyage by such freezing, of which notice was given to such consignees; that, thereupon, the consignees and the plaintiffs took possession of such wheat, and received and stored it at the place of detention. Also, that the damage to such cargo was caused by drawing off the water of the canal by the state officers having charge thereof. Also, that before the assignment to the plaintiffs of the claim in suit, the damage and injury to such

cargo was agreed upon, adjusted and settled between the defendants and the consignees, which included the cause of action as set out in the complaint.

All the issues in the action were referred to a referee, to hear and determine. No evidence was given on the trial before such referee of the cause of damage to the cargo in question.

On such trial, the defendants' agent, Stout, testified, in substance, that he made a settlement with Requa, the agent of the consignees (L. Roberts & Co), Its figures were on the back of the receipt, which was that before mentioned, ·dated May 9, 1861. They were a statement of the settlement in full. While making such settlement, the *matter of the transfer of a portion of the cargo of the Lyman Denison to the vessel by which it was finally brought to New York (the Northamptonshire), was talked over.* A claim was made for a deficiency of fifty-six bushels, also *for damage to the cargo, in addition to the sum of fifty dollars* mentioned in such statement, which was *allowed.* Other claims were made, which he refused. On being cross-examined, he stated that he then knew that part of the cargo of the L. Denison was not there to deliver; and, first, that he did not, and then that he did, know that it had been sold or damaged, and taken out and sold; that they talked about the part not delivered, but couldn't say what it was, as it was four years previously. Mr. Requa claimed for the full amount of the difference between what was delivered and the amount in the bill of lading, and no other claim was referred to. The witness had no figures before him of the damage at Fort Plain. The item in the bill, "*Less for general average,*" was what he called the damage. He could not tell how they got at the figures. The clerk of the consignees (Requa) testified that he signed the receipt; the business was done between Stout and himself, but he *did not recollect* that anything was said or done about the damaged part of the cargo, or any discussion of the claim. He *thought it was not embraced.* He also testified it was customary to make a deduction in such cases; he did not know why. An adjuster of losses

(Higgins) testified that " there was always made a deduction of fifty dollars from the freight bill on cargoes of grain, * * irrespective of the extent of the damage or amount of loss ;" it was generally deducted by the consignee out of the weight, in the regular course of business."

On the trial, the witness Requa testified he paid a certain sum ($257.38), which was the balance due according to the settlement, and took a receipt. A blank form of a policy of insurance, purporting to be made by the plaintiff, but not signed by any person, without any statement in it of any party, amount or subject insured, any voyage, duration of the risk or premium, was introduced in evidence, and its admission excepted to by the defendants; but no motion was made to strike it out. It contained a provision that there. was to be *no abandonment of the subject insured*, and another, that " should any loss or damage under that policy be occasioned by any other vessel, person, or persons, in such manner that" the latter " should be liable therefor, then all claims for such loss or damage should be assigned to the company, for their benefit, in proportion to the amount of such loss sustained by them."

The referee made a report, whereby he found as facts : the shipment of the cargo, its damage by water, its abandonment to the plaintiffs, the taking possession of it by them, the sale by them of the damaged wheat, the reshipment of the residue to New York, the receipt thereof by the consignees, the assignment by such consignees of their claim for damages in consideration of the payment by the plaintiffs to them of their loss ($2,461.98), and a settlement three days afterwards by the defendants with such consignees for freight and charges, the former receiving and giving a receipt for the balance due, in which an allowance was made for a certain number of bushels (56 2-100) short delivered. He also stated therein, as matter of law, that " by reason of" the abandonment of the goods to the insurers, their payment of the loss on their policy, and, " by virtue of " the assignment to them, they were subrogated to all the rights of consignees in the bill of lading ; and that the circum-

stances of the case constituted notice to the defendants of
the intervening rights of the plaintiffs *as insurers* of the pro-
perty injured; and their settlement with the consignes
"was without effect on the previously acquired rights of the
plaintiffs, and did not adjust or settle any part of the claim
made in this action;" and that the plaintiffs were entitled
to recover against the defendants the amount of such liqui-
dated damages, with interest.

Exceptions were taken to such findings by the defendants,
and they appealed from the judgment, which appeal was
now heard.

J. HUBBELL, *for defendants, appellants.*
W. ALLEN BUTLER, *for plaintiffs, respondents.*

ROBERTSON, Ch. J. The plaintiffs in this case, if they
were assignees of the cause of action before any settlement
made by the defendants with the consignees, unless such
defendants had no notice of such assignment, were entitled
to recover; or so, too, if they had a legal right in equity to
such settlement, and the defendants knew the facts out of
which such equitable rights arose, a settlement made in
fraud of such right would be void. It has been frequently
held in the courts of this state, as well as those of Massa-
chusetts, that where an owner of goods insured, and dam-
aged by perils insured against, abandons all *spes recuperandi*
to the underwriter, the latter, on paying the loss, is entitled
to be subrogated to all the rights of the insured—to recover
against third parties who caused the damage, by neglect or
otherwise. (*Atlantic Insurance Co.* agt. *Storrow,* 1 *Edw.*
621; *S. C.* 5 *Paige,* 585; *New York Insurance Co.* agt. *Rou-
let,* 24 *Wend.* 513; *Rogers* agt. *Hosachs, Ex'rs,* 18 *Wend.*
319; *Ætna Fire Insurance Co.* agt. *Tyler,* 16 *Id.* 385; *Hart*
agt. *Western Railroad Co.* 3 *Metc.* 99); and the entire
destruction of the subject of insurance (*Mayor, &c., of New
York* agt. *Pentz,* 24 *Wend.* 668; *Opinion of* VERPLANCK, *sen.*),
or the payment of the loss (*New York Insurance Co.* agt.
*Roulet,* 24 *Wend.* 516, *per* EDWARDS, *sen.*), has been consid-

ered equivalent with an abandonment in giving the insurer such right of subrogation. In the case of a common carrier, it is true, the owner of goods transported by him may, by agreement, give him the benefit of an insurance on them, affected by such owner, so as at least to deprive the underwriter of any remedy against such carrier, although such insurance was made without knowledge by the underwriter of such agreement with such carrier (*Mercantile Mutual Ins. Co.* agt. *Calebs*, 20 *N. Y. R.* 173). In fact, such carrier is an insurer as well as the underwriter, and their rights seem to depend entirely on the action of the owner, who may, by previous agreement, give either the preference in having a claim against the other, in case of a loss.

The referee in the present case appears to have assumed that an abandonment of some kind was necessary to entitle the plaintiffs to recover. He states in his report that the plaintiffs, "*by reason of*" an abandonment which he had previously found as a fact, and their payment to the consignees of the amount of their loss, "as well" (meaning, undoubtedly, "as much") as *by virtue* of the assignment to them, acquired the rights of the consignees. That he meant that such rights were acquired by either means, separately and indifferently, I think evident from his contrasting the phrases "by reason of" and "by virtue of," as well as his use of the word "*subrogated*," to express the mode of acquiring such rights, which is not appropriate to an assignment, and his succeeding statement "that the circumstances of the case constituted notice to the defendants of the intervening rights of the plaintiffs" [not as assignees, but] "*as insurers* of the property injured; and that, therefore, "their settlement * * * was without affect on the previously acquired rights of the plaintiffs." I cannot doubt, therefore, that the referee meant to rest his conclusions as much, if not more, on the right of the plaintiffs *as insurers* to whom the consignees had, by other means, transferred all their interest in the goods, than on their right as assignees, particularly as he does not speak of any express or implied

notice of *the assignment* as such before the settlement, which would be necessary to defeat it.

There is no evidence in this case of a direct and formal relinquishment by the consignees of all their interest in the damaged grain to the plaintiffs; and the question of its abandonment as a fact is, therefore, not without difficulty in this case. The preliminary steps of possession taken by the plaintiffs of such damaged part, by direction of the defendants, after a series of notices of the loss, first by the latter to the consignees, then by them to the plaintiffs, and finally, some negotiations between the parties to this action, did not constitute an abandonment; nor would the mere sale of part of the cargo, and the receipt of its proceeds by the plaintiffs, unless by the consent of the consignees, operate as such. In fact, at the time when the plaintiffs thus took possession of the cargo, it was still in possession of the defendants as carriers; and they only delivered it to the plaintiffs to take charge of it for the parties interested. There is no direct evidence that the consignees, at that time, had any agency in the transfer of the property. Subsequently, however, *their* agent, in the very receipt given by him to the agent of the defendants, on the 9th of May, 1861, and which they claim to be a settlement, admitted that the damaged grain *had been received by the consignees* at Fort Plain, thus recognizing the delivery to the plaintiffs as a receipt by themselves. The damaged grain having been sold by the agent of the plaintiffs, and its proceeds received by them, they *settled with the consignees as for a total loss of the damaged grain,* without regard to such sum so received. That evidence was certainly strong enough to have defeated any action by the consignees against the plaintiffs for the conversion of such damaged grain. I think it was also evidence from which the referee was at liberty to infer an abandonment of the damaged grain. (*See New York Insurance Co. agt. Roulet,* 24 *Wend.* 513.) And if necessary for the determination of the case, we ought not to disturb his finding upon that point.

I am, however, inclined to think that even the payment

of the loss alone, particularly as a total one of the grain damaged, entitled the plaintiffs to be subrogated to the rights of the consignees, so far as such loss was concerned. Otherwise, the consignees would be entitled to double compensation, and the policy of the plaintiffs become a mere wager one, since the consignees were entitled to be fully indemnified by the defendants, who were in fact equally insurers. In such case, neither would be entitled to recover against the other what they might be compelled to pay. In this very case, the consignees received fifty dollars from the defendants, for damage to the cargo, which was not credited to the plaintiffs in their settlement with them. On the payment of a partial loss, the inchoate right or equity of the plaintiff must become complete, because there can be no abandonment. In the case of *The Mayor, &c., of New York* agt. *Pentz* (24 *Wend.* 668), it was held that the plaintiffs were entitled to recover the full value of property destroyed by municipal authorities to prevent the spread of a conflagration, without regard to an insurance made thereon, because the insurers were entitled to be subrogated, or a reduction of their liability, to the extent of the amount recovered from the city, without regard to an abandonment, which would have been useless. It is laid down in a case in the same volume of reports (*p.* 576, *The New York Insurance Co.* agt. *Roulet*) that the mere payment of the loss by an underwriter entitles him in equity to *whom may be recovered* from other parties on account of the loss, and necessarily to be subrogated so *as to recover* such money, and nothing is said of abandonment. In *The Atlantic Insurance Co.* agt. *Storrow* (*vide sup.*), a cancelment by the owner of goods of a bill of lading, and a discharge of the ship owner from liability for the loss of such goods by thieves, was held to entitle the insurer in equity, after a judgment against him for the loss, to be relieved from it, and no question was raised of any necessity of abandonment. Of this equity of the plaintiffs the defendants were bound to take notice, as they knew of the policy, and invited the plaintiffs to take possession of

the goods for the benefit of all parties, and any settlement made by them was subject to such rights.

If the plaintiffs could entitle themselves by any act to take the place of the consignees in prosecuting the defendants for the damages to the grain, caused by the negligence of the latter, a settlement between the defendants and consignees, for fifty dollars, of all claims for such loss, admitted to have been over $2,000, with knowledge of the facts out of which the right of the plaintiffs arose, and of the extent of the loss, would have been a fraud on them. But, in fact, on the evidence, the referee was not bound to find that any such settlement took place. He has ignored it in his report, and in order to sustain that, we want and must presume he found against it, if the evidence justified such finding.

The receipt, on the back of which, according to the testimony of the plaintiffs' agent, the figures or details of the supposed settlement were made and given, was merely for the cargo delivered in New York; and such agent was unable to recollect what was said about the part of the cargo delivered at Fort Plain. All the items in such statement, except the one for fifty dollars, refer expressly only to the grain delivered in New York. That item is stated to be " for general average," which clearly is not applicable to a claim of damages for *a loss by negligence.* Two witnesses (Requa and Higgins) state that it was the custom to deduct such sum on the settlement of all freight bills for grain in bulk. Such indorsement states the charge to be for freight of the amount delivered in New York, and no charge is made for freight of the damaged cargo. The written document, therefore, which is constituted of the receipt and statement indorsed together, purports to relate only to delivery, freight and allowances, in reference to the grain brought to New York, and only refers to the residue to state it was received at Fort Plain, without making any charge for transportation, which, by the bill of lading, was to have been fifteen cents per bushel. If all the damage to the cargo, for which the defendants were responsible, was only fifty dollars, or that was for general average, or some other custom-

ary allowance, they were clearly entitled to freight *pro rata ;* yet nothing seems to have been said of it.

The express character of such written document, was not varied by the other testimony of the agent of the plaintiff (Stout). All he could say of the claims made by the agent of the consignees (Requa) was, " that he claimed the difference between *the cargo delivered,* and what the bill of lading called for. He made no other claim for damage than the one referred to ;" that " they claimed for shortage ;  *  *  * that the delivery was short fifty-six bushels, and that they should be allowed for that ;" but he further states, that " *they also claimed to be allowed for damages to the cargo, in addition to the sum of fifty dollars ;* which was also agreed to, and allowed." No such claim appears on the statement, nor does it appear what was the amount. He could not tell how they got at the sum of fifty dollars, and could not recollect, after the lapse of four years, what was said about the portion of the cargo not delivered, although it was talked about. And he first testified that he did not know that part of the cargo had been stored, nor could he say that he had been informed that it had been either stored or sold ; yet, subsequently, when speaking of the conversation as to the damaged cargo, he states, that he " knew a part had been taken out and sold, and that there was a loss." He says, " the item in the bill, ' less for general average,' is what he called the damage." Mr. Requa, the consignee's agent, thought (as he testified) that the claim for the damaged portion of the cargo was *not* embraced in the settlement. He did not recollect any discussion, or anything said or done about the damaged portion of the cargo. With so plain an exclusion of all consideration of the damage to the part of the cargo not brought to New York, by the receipt and statement indorsed, it would be dangerous to trust to the imperfect recollections and vague statements of one of the parties to such settlement, after a lapse of four years, where a claim of two thousand dollars on the one side is alleged to have been relinquished for fifty, and all claim for over two hundred and sixty dollars for freight, waived on the other, with-

out the slightest recollection of any discussion of the claim by either party. The referee was, therefore, warranted in disregarding such transaction as a settlement of the present claim.

I have not been able to discover how the blank form of a policy of insurance read on the trial, had anything to do with this case. No connection is shown by other evidence between it and any of the parties, or any document or transaction. It is said to have been read in evidence. Some proof must, therefore, be presumed to have been given in relation to it, or admission made as to its authenticity, as the only objection was to its competency as between the parties to this action, and not to any want of proof. It might have been made relevant by other proof, connecting it with other transactions, such as evidence that it was the form of policy adopted by the plaintiffs with the consignees of the cargo in question, and was, therefore, not necessarily to be excluded when offered. No motion was made to strike it out; the referee was not called upon to disregard it, and it does not seem to have affected his decision; no advantage, therefore, can now be taken of its admission.

There is apparently no evidence in the case to sustain the referee's finding of a settlement between the consignees and defendants, three days after the assignment to the plaintiffs, although Mr. Requa does testify that he paid Mr. Stout *a certain sum* ($257.38), as part of the sum due according to the previous settlement, and "took a receipt, *the one already produced in evidence.*" No such receipt appears in the case, but the sum is the same as that specified in the imaginary receipt set out in the referee's report. Such a receipt, if it existed, would have a strong bearing upon the question of any prior adjustment of the claim for damages, if given with knowledge of the assignment; but it is not before us, and may be considered as stricken out of the report, with whose findings of facts and legal principles it does not interfere, particularly as no exception was taken to the finding of fact based upon such receipt.

The judgment should, therefore, be affirmed, with costs.